*In re* ACQUISITION OF 306 GARFIELD

(CITY OF DETROIT v KING)

Docket Nos. 146996, 159077. Submitted March 9, 1994, at Detroit. Decided October 3, 1994, at 9:35 A.M.

The City of Detroit brought a condemnation action in the Wayne Circuit Court against Bertha King, seeking to acquire 306 Garfield, at which the defendant had operated a licensed adult foster care facility with twenty beds before it sustained damage in a fire and additional damage from vandalism after the fire. Following a bench trial, the court, William J. Giovan, J., awarded the defendant $142,350 as just compensation, but denied her request for witness fees for one of her appraisers. The plaintiff appealed the compensation award, and the defendant appealed the denial of witness fees. The appeals were consolidated.

The Court of Appeals *held:*

1. The trial court, in determining just compensation of $142,-350 by subtracting a cost-of-repair figure of $75,000 from a valuation figure of $217,350 based on a comparable twenty-bed adult foster care facility on the stipulated date of taking, complied with MCL 213.70; MSA 8.265(20). The statute provides that a change in the fair market value before the date of the filing of the complaint that the condemnor or the condemnee establishes was substantially due to the general knowledge of the imminence of condemnation, other than due to physical deterioration of the property within the reasonable control of the condemnee, must be disregarded in determining fair market value and that the property must be valued as though the acquisition had not been contemplated. The inclusion of the value of the defendant's business as a going concern in the award of just compensation was supported by testimony at trial indicating that the defendant's business was not transferable to another location and that the defendant would have restored the property for use as an adult foster care facility were it not

REFERENCES

Am Jur 2d, Eminent Domain §§ 267, 273, 287, 477.

Eminent domain: condemnor's liability for costs of condemnee's expert witnesses. 68 ALR3d 546.

for the condemnation action. The trial court did not err in assigning to the plaintiff the cost of repair of damage from vandalism in the absence of a showing by the plaintiff that such damage was within the reasonable control of the defendant.

2. The trial court did not abuse its discretion in denying the defendant's request for witness fees on the ground that the expert's services were not reasonably necessary to allow the defendant to prepare for trial.

Affirmed.

1. EMINENT DOMAIN — JUST COMPENSATION — CHANGES IN FAIR MARKET VALUE.

A change in the fair market value of property before the date of the filing of a complaint for the condemnation of that property is to be disregarded in determining just compensation for the property if the change is substantially due to the general knowledge of the imminence of condemnation and if the change is not due to physical deterioration that is within the reasonable control of the condemnee (MCL 213.70; MSA 8.265[20]).

2. EMINENT DOMAIN — BUSINESS PROPERTY — GOING CONCERN VALUE.

Recovery of the going concern value of a business lost to condemnation is allowed where relocation of the business is foreclosed.

3. EMINENT DOMAIN — CONDEMNATION ACTIONS — WITNESS FEES.

Fees for expert witnesses whose services are reasonably necessary to allow the condemnee to prepare for trial of a condemnation action must be awarded by the trial court; the trial court's determination of reasonable necessity for the expert's services is reviewed on appeal for abuse of discretion (MCL 213.66; MSA 8.265[16]).

*James C. Cobb, Jr.,* for the plaintiff.

*Kenneth M. Davies,* for the defendant.

Before: WHITE, P.J., and MICHAEL J. KELLY and W. J. CAPRATHE,* JJ.

WHITE, P.J. In these consolidated appeals as of right, plaintiff City of Detroit appeals the trial

* Circuit judge, sitting on the Court of Appeals by assignment.

court's order to pay $142,350 as just compensation for defendant's property, and defendant appeals the denial of her motion for expert witness fees. We affirm.

I

This is a condemnation case. Defendant owned property at 306 Garfield and had, since 1976, operated a 2½ story, thirteen-bedroom, twenty-bed, adult foster care facility on it. On December 21, 1988, a fire caused by careless smoking by a resident destroyed the building. By the time the city filed its condemnation suit on July 31, 1990, the property, which had gone unrepaired, had also been vandalized.

Real estate appraiser Sharon Harbin, who testified for the city, stated that she had inspected the property for the city, beginning in December 1989, and had appraised its fair market value at $15,000 on May 5, 1990, using vacant land sales as comparables because of the unusable state of the building. On cross-examination, Harbin acknowledged that she had been contacted by the city concerning appraisal of the property in the summer of 1989, and knew "for sure" by November 1989, when the city contracted for her services, that the property would be condemned. Harbin also testified that for tax purposes, the city had assessed the property at $25,400. Harbin acknowledged that the property was repairable if one gave no regard to cost, but opined, in essence, that practically, it was unrepairable. However, estimating the cost of repairs to be at least $100,000,[1] and assessing the property as an operable foster care facility comparable to

[1] Harbin was not permitted to testify concerning the estimated cost of fire-damage rehabilitation given her by an independent expert before the property suffered more extensive damage from vandalism. However, her estimate of damages exceeding $100,000 appears to

similar facilities, Harbin's valuation of the real estate was $85,000. Because Harbin believed that the "highest and best use" of the property was as vacant land, her appraisal figures did not include the ostensible value of the foster care business itself.

Testimony from an assistant city council clerk established that on March 22, 1989, the city's planning department proposed the development of a new Veteran's Administration (VA) Hospital in the Detroit medical center, affecting a three-block area including the property in issue. A resolution adopting an ordinance to that effect was passed on April 26, 1989. The clerk testified that notice to the affected parties would have been sent at least ten days before that date.

Unlike the city's appraiser, defendant's real estate appraisers included the value of the foster care business in their appraisals of the property's value. Andrew Chamberlin made his January 1, 1989, appraisals on the assumption that repairs would be undertaken. Chamberlin indicated that, because of the state of the building at the time, his appraisal of the building's value was predicated on discussions with defendant, her husband, and neighbors, and on city records. Chamberlin used two approaches: the market approach and the income approach. The income approach, based on an annual average net income of $34,489, an eleven percent capitalization rate, and a 12½ percent vacancy rate (taking into account the time needed to repair the structure), yielded the figure $313,000, from which Chamberlin then deducted estimated repair costs of $80,000. Chamberlin testified that he was aware of another estimate of $100,000 for repairs, but noted that this figure

have included damage from vandalism, indicated by the May 5, 1990, appraisal date.

included the cost of repairing the damage from vandalism. The market approach, using four comparables, yielded the figure $300,000, based on a value of $15,000 for each bed as repaired, from which repair costs of $80,000 were subtracted. Though Chamberlin considered a twenty-bed facility more valuable than comparable twelve-bed facilities, he did not offer a specific figure for the difference in value, but discussed both the inherent cost advantages and the rarity of twenty-bed facilities. In this regard, Chamberlin testified that, according to city building and safety personnel, the city was no longer issuing permits for construction of new adult foster care homes involving more than six beds, or processing permits for conversion of other facilities to foster care homes involving more than six beds. Thus, defendant would not be able to relocate her twenty-bed facility elsewhere in the city.

In response to the court's questions, Chamberlin explained that licenses to operate an adult care facility are not transferable; however, while they are issued to the operator, they can be transferred with the property. Thus, a prospective purchaser of a licensed facility would buy the property with the expectation of, and contingent upon, the Department of Social Services' extension of the license to the buyer after purchase. A license to operate such a facility, therefore, substantially enhances the value of the property.

Thomas Walsh, defendant's second appraiser, testified that he appraised the property between the summer of 1989 and the spring of 1990. Walsh found the property repairable, but estimated that because of the extensive damage from vandalism at that time, it would cost at least $100,000 to do so. He noted, however, that at the time, it was apparent that the city intended to condemn the

property. He referred to a newspaper article indicating that the VA had approved the area including the property in issue for its proposed new facility, "common knowledge" that the area had been "set aside or designated" for that purpose, and to the city council's approval of the ordinance to that effect in the spring of 1989. Walsh also testified that, according to city zoning personnel, only adult foster care facilities with a six-bed maximum would receive approval. Thus, defendant would not be able to relocate within the city.

Walsh, like Chamberlin, appraised the property as if it were still in operation, explaining that it was his belief that were it not for the proposed VA development, defendant would have repaired the building and resumed its use as a twenty-bed facility. However, Walsh used only the market approach, employing five comparables (three of them the same as Chamberlin's) to arrive at the property's June 1990 fair market value, which he concluded was $300,000, less the $80,000 repair figure offered by the insurance adjuster, or $220,000. As did Chamberlin, Walsh testified that the cost advantages and the rarity of a twenty-bed facility were added value factors. Asked what the property would have been worth used only as a residence, Walsh answered, "somewhere in the area of sixty to seventy thousand dollars," but emphasized that the "highest and best use" of the property was as the twenty-bed facility it had been. Walsh estimated that to convert a previously unapproved building capable of housing twenty residents to a facility in compliance with all regulations would cost at least $100,000.

Defendant testified that she had been prepared to repair the property, that it was to her financial advantage to do so, that she had the money to pay

for it,[2] and that she had made repairs to fire-damaged foster care properties in the past. She explained that she did not repair the property after the fire because she was aware, even before the fire occurred, that the VA intended to build a hospital there. Defendant referred to newspaper articles, notices from an area citizens' council, and notices from the city, at least some of which gave rise to her belief that groundbreaking would begin in the spring of 1989, if not earlier. Defendant also testified that she had made efforts to relocate her facility, but the city's building permit restrictions made it impossible for her to do so. Defendant stated that she was informed by building and safety department personnel in the spring of 1989 that no permits for new foster care facilities were being issued. Defendant also testified that although she was notified of an impending visit by a representative of the city's Community and Economic Development Department (CEDD) (apparently in order to discuss relocation), no further contact occurred.

Insurance adjuster Bruce Copus testified that when he inspected the property on December 28, 1988, the cost of repair would have been between $70,000 and $80,000.

Department of Social Services (DSS) adult foster care licensing supervisor Thomas Stuve testified that the DSS requires zoning approval or a special-use permit before it will issue a license for a foster care facility in the City of Detroit involving seven to twenty beds. Stuve was aware of three requests made since August 1989 that were still pending at the time of trial, and confirmed that the DSS had

---

[2] Defendant testified that her insurance company had rejected her request to insure the property for $180,000, and for reasons of policy, refused to insure for any more than $40,000, but that she had other sufficient financial resources on which to draw for repairs.

issued no new licenses for seven- to twenty-bed facilities in the city since January 1989. On cross-examination, Stuve stated that at the city's request he had helped to secure an existing licensed facility, so that another facility subject to condemnation proceedings, the Hancock Residential Center, with sixteen beds, might relocate. However, he also testified that no mention of new sites or special-use permits was made.

Tyrone Miller, director of the board of zoning appeals, called as a rebuttal witness, confirmed that new applications for adult foster care facilities had been put on hold since 1989. However, referring to the Hancock Center relocation, he stated that where adult foster care homes were being displaced, the board was hearing cases, and that it would be possible for a displaced home to relocate. In response to the court's direct inquiries, however, he acknowledged that no decision had as yet been made on any displacement case, including the Hancock Center relocation, and that the board had not approved a license for a twenty-bed facility since 1988.

Rebuttal witness Donald Brownell, the head city planner for the city's building and safety engineering department, testified that he was aware of a freeze on the issuance of permits, but had not been involved in it because his division had not been receiving applications. However, he stated that the department had issued a permit for a twenty-bed facility in October 1989.[3]

CEDD senior urban renewal assistant Frederick

---

[3] After Brownell finished testifying, Stuve was recalled to testify concerning the address for which the twenty-bed permit had been granted. According to Stuve, that address had previously been licensed as a twenty-six-bed adult foster care facility, from 1976 until 1986, when the DSS revoked its license "because of quality of care problems by the licensee." Thus, the permit was not granted for a new location, but for one permitted to reopen under new ownership.

Rottach testified that he had helped the Hancock Center in numerous ways, including finding a new site, applying to the building and safety department for a permit at that site, setting up informational meetings, and requesting approval from the board of zoning appeals. Rottach testified that the board had heard the Hancock Center's case, but had not been able to vote on it for lack of a quorum. However, Rottach was permitted to testify that it was the intention of all board members present to approve the proposed use. Rottach was aware that the city had offered the Hancock Center over $500,000 for its property, and that both the Hancock Center and another adult foster care facility affected by the condemnation, the Lewis Manor home, with twenty beds, had been appraised as "going businesses," with business value included in the final real estate figure. However, Rottach stated that while the city offered compensation for real estate, business interruption, and attached fixtures, he did not think it had offered compensation for the businesses themselves because of the possibility of relocation. Rottach was aware of the permit freeze on adult foster care homes, but stated that it was not imposed until 1990. The letter imposing the freeze, dated March 19, 1990, was admitted into evidence. Rottach testified that the freeze would not prevent attempts to relocate existing foster care facilities under condemnation.

At the close of the evidence, the city moved for a directed verdict, arguing that defendant had not proven "an absolute ban" on permits for new facilities, thus failing to show that she could not relocate. The trial court denied the motion, stating that it could not say as a matter of law that defendant could relocate because the evidence on that point was conflicting.

Subsequently, the court, sitting without a jury, summarized its findings. It found "intransigent" the city's position that the property was worth only its "bare value" of $15,000, because, on the date of taking, the property still had potential for rehabilitation and reuse as a twenty-bed adult foster care facility. Relying on *Detroit v Michael's Prescriptions,* 143 Mich App 808; 373 NW2d 219 (1985), the court concluded that the proper measure of damages was the "unitary value" of the real estate and licensed business together, and that such a conclusion was supported by the evidence. In reaching that conclusion, it particularly noted the significance of an existing license: that the sale of property used as a licensed foster care facility would be contingent upon the "transfer" of that license to the purchaser. It also noted that none of the witnesses suggested that the fire-damaged building could not have been repaired for $70,000 to $80,000 immediately after the fire, leaving only the question of who would bear the additional costs of repair stemming from vandalism. Using as a comparable a twenty-bed facility sold in 1987 and referred to by both of defendant's appraisers, and adopting a fifteen percent upward adjustment for an equivalent sale in 1990 and a five percent upward adjustment for a more valuable location, the court arrived at a figure of $217,350. The court then deducted $75,000 for the cost of repairing the fire damage, resulting in a final figure of $142,350.

Commenting both on defendant's failure to rehabilitate the premises before the actual taking and on who should bear the effects of vandalism, the court concluded:

> The process of excusing—another way of excusing the defendant from being required to promptly

rehabilitate the premise is recognition of the principle embodied in the statute [MCL 213.70; MSA 8.265(20)], that in valuing the real estate the threat of condemnation must be ignored. And that is—and the threat of condemnation, of course, is what reasonably caused Mrs. King not to repair the premises.

And I suppose that it is that very—if she was reasonable in not repairing the premises, I suppose to that extent she's excused from the effects of vandalism, that the—because the threat of condemnation comes from the plaintiff and not the defendant and because the property is supposed to be valued without the threat of condemnation.

I think the net result is that the effect of vandalism unfortunately has to be borne by one of the parties and that analysis is the best one I can arrive at in determining where the burden lies.

It seems to me that the City as it turns out bears the onus of ignoring the threat of condemnation, that that's where the onus falls. Now it just crosses my mind that in another case ignoring the threat of condemnation might fall, you know, in the City's favor, but that's not true in the case at bar.

II

The city argues that the trial court (1) improperly awarded damages for injuries to the property that occurred before the date of taking and were not caused by the city; (2) erred in awarding compensation for the property on the basis of what it might have been worth if rehabilitated, less the cost of rehabilitation; and (3) erred in awarding compensation for the going concern value. The city contends that as of July 31, 1990, defendant's property was fire-damaged, vacant, and vandalized, and, under MCL 213.70; MSA 8.265(20), should have been valued as such. The city asserts that to

value it otherwise is to compensate defendant for fire damage and vandalism that took place before the taking and that the city did not cause. We disagree.

The trial court recognized July 31, 1990, as the taking date and determined a value based on that date. The court did not compensate defendant for fire damage. Rather, it deducted the cost of repairing the fire damage from the award. Further, the court did not directly compensate defendant for damage caused by vandalism before the taking date. Rather, the court declined to subtract the cost of repairing the damage due to vandalism from the value of the property, concluding that the vandalism was due to the threat of condemnation. Lastly, there was evidence to support the court's decision to value the property as an ongoing nursing-home facility.

A

Implied in the city's arguments is the assertion that the trial court applied a wrong date of taking. In this regard, the city observes that defendant stipulated to a taking date of July 31, 1990, and did not exercise her statutory right to assert through a counterclaim a constructive taking at an earlier date.[4]

The court did not use a date other than the stipulated July 31, 1990, taking date. The court determined the value of the property and business

---

[4] We note that even before the events in question took place, defendant was joined in a 1987 inverse condemnation suit that was dismissed when the city agreed to move forward with its intended condemnation procedures. Furthermore, the evidence before the court indicated that the threat of condemnation was longstanding: news of the impending condemnation preceded the date of the fire, and notice of its imminence issued within a few months of the fire.

on that date.[5] In doing so, the court relied on MCL 213.70; MSA 8.265(20)[6] and valued the property without the threat of condemnation, interpreting that term to mean, in this case, the property repaired as it would have been had condemnation not been threatened, less the costs of repair. While it might have behooved defendant to file a counterclaim asserting a taking date before the fire, there was no evidence that the value of the property and nursing-home business had gone down between the December 1988 fire and the July 31, 1990, taking, or that the estimated cost of repairing the fire damage (as opposed to the damage from vandalism) had gone up between those dates. Thus, even if the property had been valued on the basis of an earlier date immediately after the fire, the earlier valuation would not have benefited defendant.

We note that the city's argument concerning the taking date would have force had defendant sought to argue, as was asserted in an earlier lawsuit (see n 4), that the real taking date was in

[5] While one statement in the court's opinion implies that the property was valued on the basis of an earlier date, "immediately after the fire," it is clear from the opinion, viewed in its totality, that the statement referred to the method of valuation, and the court focused on July 31, 1990, as the date of taking.

[6] MCL 213.70; MSA 8.265(20) provides:

A change in the fair market value before the date of the filing of the complaint which the agency or the owner establishes was substantially due to the general knowledge of the imminence of the acquiring by the agency, other than that due to physical deterioration of the property within the reasonable control of the owner, shall be disregarded in determining fair market value. The property shall be valued in all cases as though the acquisition had not been contemplated. The date of acquiring and of valuation in a proceeding pursuant to this act shall be the date of filing unless the parties agree to a different date, or unless a different date is determined by a counterclaim filed pursuant to section 21 [MCL 213.71; MSA 8.265(21)]. The value of each parcel . . . shall be determined with respect to the condition of the property and the state of the market on the date of valuation.

1987, before the fire. In that situation, defendant would indeed have been seeking damages for the value of the property in its undamaged state and based on the earlier date. Absent a counterclaim, she could not do so. In the instant case, however, she did not seek the value of the property based on a date before the fire, or even immediately after the fire. Rather, she sought the value of the property on July 31, 1990, acknowledging that the property had been diminished in value by the fire. In seeking that value, she asked that the court recognize that had it not been for the threat of condemnation, followed by the actual resolution and then the filing of the complaint, she would have rebuilt the property after the fire and continued her business. She sought the value of the property as restored, less the cost of restoration. In short, she asked to be put in the position she would have been in had the taking not occurred, acknowledging that she must bear the costs of the fire. It was not necessary that she file a counterclaim asserting an earlier taking date because she did not, in fact, assert an earlier date.

B

Regarding the valuation of the property, the city's real complaint is addressed to the method of the valuation. The city argues that because the property was in a fire-damaged and vandalized condition on the date of taking, the court was obliged under MCL 213.70; MSA 8.265(20) to assess its value in that state. The statute enunciates several rules regarding valuation. It requires that the property be valued "in all cases as though the acquisition had not been contemplated." It also states that value "shall be determined with respect to the condition of the property and the state

of the market on the date of valuation." The statute must be interpreted and applied so as to effectuate its purpose of providing just compensation and placing the property holder in as good a position as she would have been had the taking not occurred. *Dep't of Transportation v Dondero*, 171 Mich App 567, 571; 430 NW2d 785 (1988). The court properly applied the statute.

The trial court concluded, and the city conceded, that defendant's failure to repair the fire damage to her property was reasonable in light of the threat of condemnation. Indeed, it would be contrary to public policy and common sense to require the expenditure of considerable sums on a building that is expected to be demolished. Because it was reasonable not to repair the damage when it occurred, given the threat of condemnation, it was also reasonable not to repair it any time thereafter as the condemnation grew ever more imminent, including the date of the taking.

The statute authorized the court to take these circumstances under consideration in determining just compensation on the date of taking. A contrary view would require a property owner in defendant's position to needlessly restore the premises in order to be made whole. Simply filing a counterclaim asserting an earlier date of taking would not achieve just compensation: A taking date immediately before the fire would lead to excessive compensation by valuing the property without regard to the fire damage; a taking date immediately after the fire would pose the same problems posed by the July 31, 1990, date, because the property was fire-damaged as of that date. If the statute is interpreted as the city advocates—to require valuation of the property in its actual condition (fire-damaged) without regard to the reasonableness of the property owner's conduct in

forgoing repair in light of the threat of condemnation—the only way for the property owner to receive the value of the property (in the condition it would have been in had the property owner made the repairs she would otherwise have made) would be to actually make the repairs. We conclude that this interpretation ignores the statute's admonition to value the property as though the acquisition had not been contemplated, and that the statute authorizes the court to value the property as it did.

Nor did the court's decision involve a speculative assessment. While the city asserts that just compensation may not include compensation for the specialized use of as-yet undeveloped property, less the costs of development, where development would involve numerous conjectural factors, *In re Petition of the City of Detroit for a Park Site,* 227 Mich 132, 138-139; 198 NW 839 (1924); *State Hwy Comm v McLaughlin,* 16 Mich App 22, 25; 167 NW2d 468 (1969), this is not such a case. Here, there was testimony that the property was being used as intended before the fire, that it could have been restored for that use, that restoration would cost a particular amount, and that the owner would have expended that amount to effect restoration, but for the threat of condemnation. Thus, no speculation was involved. We conclude that in determining the property's value "as though the acquisition had not been contemplated" and "with respect to the condition of the property . . . on the date of valuation," MCL 213.70; MSA 8.265(20), the court was not obliged to value the property in its fire-damaged, vacant, and vandalized state without regard to its potential for restoration.[7]

---

[7] We note that had the court chosen to value the property in its restored state without including the value of the business, using appraiser Harbin's estimated value of $85,000, and had it then

C

We next turn to the court's treatment of the additional damage caused by vandalism that occurred after the fire and before the taking date. Plaintiff argues that the court ignored the rule that a property owner cannot recover in a condemnation action for injuries incurred before the established date of taking. *Dondero, supra.* In *Dondero,* the defendant abandoned her counterclaim asserting a 1969 taking date but still sought to claim lost profits incurred before the actual 1982 condemnation date, relating to a restaurant that had closed in 1967, and had later burned down. Despite some superficial factual similarities, we find *Dondero* inapposite. The fire in *Dondero* occurred two years before the threat of condemnation. More important, the issue here concerns the essential fair market value of the property, rather than a claimed entitlement to damages for pretaking lost business profits. *Id.* at 570.

Nonetheless, although damages incurred before the date of taking normally may not be considered, the statute itself recognizes that changes in property value do occur when condemnation is imminent, and addresses those changes: (1) changes in a property's fair market value before the taking date due to general knowledge of the imminence of condemnation are to be disregarded in determining fair market value; and (2) changes due to physical deterioration of the property within the reasonable control of the owner are not to be disregarded. At no point has the city asserted

deducted $70,000 or $75,000 for the cost of repairing the fire damage, the resulting figure would have been approximately what the city was prepared to pay for the property. Therefore, the city's complaint is not actually with the court's choice to value the property as restored, minus the cost of restoration, but with its decision to include the value of the business in its ultimate valuation.

that the damage by vandals was within defendant's reasonable control. The city having conceded that defendant's decision not to repair the property given the threat of condemnation was reasonable and having chosen not to litigate whether the vandalism damage was within defendant's reasonable control, we cannot say as a matter of law that the court erred in assigning to the city "the onus of ignoring the threat of condemnation," by declining to deduct the additional costs of repairing the damage due to vandalism.

D

Turning to the question whether the trial court properly included the value of the business in evaluating just compensation—the amount needed to place defendant in as good a position as she would have been had the condemnation not occurred, *Dondero, supra*—we see the court as having had three options. The first was to assess what it called the "bare value" of the property on July 31, 1990, without regard to the property's potential for restoration to its former state. The second was to assess the value of the restored property, not including the value of the business, less the cost of restoration. The third was to value the restored building as an ongoing nursing-home business and then deduct the cost of restoration.

The third option, chosen by the court, is restricted to certain situations only. Inclusion of the value of an ongoing business is justified where the business operation on the condemned property is nontransferable. *Michael's Prescriptions, supra* at 819-820. Transferability is decided case by case, considering such factors as a location not easily duplicable, or an integral neighborhood. *Id.* The city argues that the court's decision to value the property as an ongoing nursing-home business was

erroneous because it involved a speculative assessment, and also granted damages for loss of a business ("going concern") without making the necessary supportive findings.

We have concluded that the court's valuation did not involve a speculative assessment. And, while the trial court did not address the issue of transferability in great detail, we believe the findings are sufficient. On the basis of extensive testimony offered at trial, the court concluded that because of the nature of the building and the licensing, "the business and the real estate are like one." Additionally, while the city offered evidence to the contrary, there was substantial evidence to support defendant's position that the city would not have permitted her to reopen her twenty-bed facility at a different location.

II

Lastly, we find no abuse of discretion in the trial court's denial of defendant's motion for recovery of expert witness fees for her fixture appraiser's services. Under MCL 213.66; MSA 8.265(16), expert witness fees "shall be allowed with respect to an expert whose services were reasonably necessary to allow the owner to prepare for trial." While such awards are mandatory, *Hartland Twp v Kucykowicz,* 189 Mich App 591, 599; 474 NW2d 306 (1991), reasonable necessity is to be determined by the trial court, and reviewed by this Court under an abuse-of-discretion standard. *Id.* at 599, 600. Having reviewed the record, we conclude that there is adequate support for the court's determination that the fixture appraiser's services were neither reasonable nor necessary, and therefore find no abuse of discretion.

Affirmed.